In the Matter of the Estate of CHARLES G. STRANDBURG, Deceased.*

Surrogate's Court, Kings County, December 11, 1930.

* See, also, 138 Misc. 859.

*William Lurie [David S. Konheim* of counsel], for the Commercial Casualty Insurance Company.

*Joseph Epstein,* in person, for the respondent.

WINGATE, S. This proceeding arises upon an order directing Joseph Epstein to show cause " why he should not be directed to pay to Gustave Anderson, as the Administrator of the Estate of Charles G. Strandburg, deceased, for the account of said estate, the sum of Nine Hundred Thirty-seven ($937) Dollars, with interest, or, in default of such payment, why he should not be punished for contempt of court. \* \* \* "

On November 19, 1924, a petition was filed in this court by Joseph Epstein, acting as attorney for Oliver Perry Strandburg, in which the latter sought the issuance of letters of administration on the estate of Charles G. Strandburg. This petition, which was, of course, verified, alleged that the applicant was the son and sole next of kin of the deceased. A decree as prayed was made on the same day and the petitioner qualified according to law, filing a bond with the Commercial Casualty Insurance Company, as surety.

The administrator proceeded with the marshalling of the estate and caused a transfer tax proceeding to be consummated, in which the gross estate was fixed at $11,975.30, the value of the realty being placed at $8,000.

On August 19, 1925, a proceeding was instituted by Karl Y. Vendel, the Swedish Vice-Consul in New York, for the revocation of these letters of administration on the ground that they were based on a false allegation of a material fact and that Oliver Perry Strandburg was not the son nor a next of kin of the decedent, such next of kin being two nationals of the Consul, sisters of the deceased, who were residents of Kalmar, Sweden. This proceeding was instituted by the issuance of a citation returnable September 1, 1925, which was served on Oliver Perry Strandburg on August 22, 1925.

On August 22, 1925, an *ex parte* order was entered in this court suspending the powers and authority of the administrator, but there is no evidence whatsoever that this was ever served upon the administrator or his attorney.

On the return day of the citation the proceeding was adjourned. It was proved with reasonable definiteness that on this date, also, Strandburg consulted with Mr. Epstein and again strenuously asserted his kinship. In any event, an answer to this effect was verified by him on September third and filed in this court on the following day.

Shortly thereafter, Strandburg, in a conference with Epstein, confessed that he was not a son of the deceased but merely a step-son, and that he had no rightful claims as a distributee of the estate. The exact date when this occurred is not clear on the record, but it apparently occurred about September 23, 1925.

At this time Strandburg insisted to Epstein that, although not one of the next of kin of decedent, he was justly entitled to recognition by him in consequence of his long care and sacrifice of personal welfare at his request. In their consultation considerable attention seems to have been given to the possibility of obtaining competent proof of this claim for services. There is also some testimony of ineffectual efforts by Strandburg to find a Mrs. Sugarman, who, he insisted, could substantiate his claim.

The upshot of this phase of the matter was that Strandburg and Epstein agreed that the claim was impossible of legal proof and the latter suggested that an attempt be made to compromise the entire matter with the Swedish Consul, who was unaware of the weakness of Strandburg's position as a claimant. To this the latter assented, and under date of September 23, 1925, he signed a retainer agreement with Epstein, agreeing to pay him " one-half of whatever sum he succeeds in procuring for me as the amount I may be entitled to receive as my share in the settlement * * *."

Epstein was so far successful in his efforts in this direction that he procured the execution by the counsel for the Swedish Vice-Consul of a stipulation providing that the pending proceeding for removal of Strandburg as administrator should be marked off the calendar; that he should continue to act in that capacity until the expiration of a year from his appointment, at which time he should account; that he should be permitted to expend so much of the personalty of the estate as was needed for administration expenses, and that he should receive one-third of the entire estate, both real and personal, the remaining two-thirds to be paid to the Vice-Consul as the representative of his nationals. It is important to note that this stipulation or agreement was not signed by either of the principals but merely by F. Dudley Kohler, as attorney for the petitioner, and by Joseph Epstein, as attorney for the administrator, respondent.

In pursuance of this arrangement, Epstein prepared and Strandburg executed two affidavits purporting to state his receipts and expenses as administrator. These showed a net balance of $3,179.18 remaining in his hands of the estate funds. Apparently these statements were filed with and approved by Mr. Kohler.

Among the disbursements listed in these statements was an alleged expense of $500 for attorney's fees. It is reasonably

apparent from the testimony that up to this time Epstein had received only $127, which was paid him by Strandburg at the time of the completion of the transfer tax proceeding and covered services and disbursements in that connection. Upon the approval of these accounts by Mr. Kohler, Strandburg drew from the estate account for his own purposes about $670, claiming that by reason of the approval of the account he was liable only for a sum equal to the remaining balance. At this point the testimony of Strandburg and Epstein conflicts, the former asserting that from this sum he paid Epstein $335, and the latter denying it. This conflict must be resolved in favor of Epstein. Strandburg stands convicted by his own admission of repeated perjury and his subsequent sworn statements are, therefore, entitled to a minimum of credence.

On or about October 30, 1925, Strandburg drew another $1,000 from the account and at or about the same time admittedly paid Epstein the sum of $400. Mr. Epstein's statements and testimony in this connection demonstrate a regrettable equivocation and lack of frankness. He emphatically asserted to the court that he had " never received a nickel " from the estate, attempting later to justify this statement by a contention that he had a right to assume that these payments to him by Strandburg were made from the latter's private funds. When it is recalled that Strandburg during this period was employed as a handy man in the Liggett Drug Company and was apparently continually in financial straits and importuning Epstein to get some money for him from the estate, and, finally, that the latter knew of the proposed withdrawal of this $1,000, personally prepared the check for the purpose, and almost, if not quite, simultaneously with such withdrawal received his payment, his lack of frankness, not to use a stronger term, respecting this phase of the matter, is somewhat difficult to reconcile with his duties as a member of the bar.

Whether or not this $400 paid by Strandburg to Epstein was technically a part of the funds of the estate, it was unquestionably so in essence.

The remaining pertinent facts are few. Karl Y. Vendel was replaced as the Swedish consular representative by Olof H. Lamm, who dispensed with the services of Mr. Kohler as attorney, and repudiated the settlement stipulation signed by the latter with Mr. Epstein. Thereafter proceedings were had in this court which resulted in the entry of a decree on January 30, 1930, settling the account of Oliver Perry Strandburg as administrator and directing him to make a payment of $70 and turn over the balance found due from him, amounting to $3,943.50, to a new administrator theretofore appointed. There is a deficit of approximately $2,042

in the funds in his hands, which he is apparently unable to make good, and an action has been begun in another court against his surety for this deficiency. The surety thereupon brought this proceeding to compel Mr. Epstein to make restitution of the sums paid him.

It must be apparent that there is no foundation for a direct contempt proceeding against Mr. Epstein on the basis of the order of August 22, 1925, since that order was never served upon him nor upon his client. (*Tebo* v. *Baker*, 77 N. Y. 33, 36; *Grant* v. *Greene*, 121 App. Div. 756, 757; *People* v. *Isaacs*, 209 id. 836; *Peters* v. *Berkeley*, 219 id. 261, 266.)

There remains, however, the question of whether he should make restitution of any of the sums paid to him. The $127 which he received for services and disbursements in connection with the transfer tax proceeding was paid long prior to any intimation that his client was other than what he claimed to be, namely, the son and properly appointed administrator of the estate of the decedent. The charge was admittedly reasonable for the service rendered, and, in the opinion of the court, the facts disclosed impose no obligation for its repayment.

As previously noted, there is no reliable testimony in the record to overcome Mr. Epstein's sworn statement that the only sum which was paid him in addition to this $127 was the $400 on October 30, 1925. Since, therefore, there is no basis for a finding that he received $335 in September, 1925, there is no foundation for a decree that he repay that sum.

The final consideration concerns the admitted $400 payment, the facts surrounding which have been noted. On these facts, the conclusion is inescapable that Mr. Epstein fully understood at the time he received the $400 from Strandburg that this sum was a part of and a payment from the $1,000 withdrawal of estate funds for which he had almost simultaneously prepared the check for Strandburg's signature. This withdrawal, on the basis of the situation which all parties then believed to exist, was not seriously culpable, although extra legal, since the matter would have adjusted itself had the settlement of the estate been carried through on the basis of the stipulation between Kohler and Epstein. The payment was not made to Epstein by Strandburg as remuneration for services to the estate but pursuant to his personal agreement contained in the retainer of September 23, 1925, under which Epstein was to receive " one-half of whatever sum " Strandburg procured in the compromise settlement of the estate.

Mr. Epstein's present obligation may be viewed from three different standpoints, all of which lead to the same conclusion.

*First.* The sum paid to him was for a service which in legal contemplation was never performed. As an attorney, he was bound to know that another attorney possesses merely a limited agency which does not extend to the compromise of his client's rights or the acceptance of less than the full relief sought. (*Lewis* v. *Duane*, 141 N. Y. 302, 314; *Arthur* v. *Homestead Fire Insurance Co.*, 78 id. 462, 469; *Barrett* v. *Third Avenue Railroad Co.*, 45 id. 628, 635; *Matter of City of New York* [*Baker*], 112 App. Div. 160, 162.) In strictness, therefore, he never " procured " for Strandburg any sum of money in settlement of his claims in the estate and *a fortiori* was not entitled to receive any sum by way of percentage. There was, therefore, a failure of consideration for the $400 payment to him, and on equitable principles he may be compelled to repay it. (*Guarantee Savings Loan Co.* v. *Moore*, 35 App. Div. 421, 423; *Sokoloff* v. *National City Bank*, 208 id. 627, 630; *Bean* v. *Carleton*, 12 N. Y. Supp. 519, 520; affd., 126 N. Y. 642; *Von Wallhoffen* v. *Newcombe*, 10 Hun, 236, 239, 240.) *Second.* It is unquestionable that Strandburg's payment to Mr. Epstein of this $400 was based upon the fundamental mistake of fact that Mr. Epstein had entered into a valid and binding adjustment of his claim against the estate, as a result of which he was entitled to one-third thereof. As events demonstrated, this condition did not exist. Since this mistake went to the root of the entire transaction, Mr. Epstein, on fundamental principles, became liable to return the sum so paid. (*Hathaway* v. *County of Delaware*, 185 N. Y. 368, 370; *Woodruff* v. *Claflin Co.*, 198 id. 470, 473, 474; *Ball* v. *Shepard*, 202 id. 247, 253; *Martin* v. *Home Bank*, 160 id. 190, 196; *Kessler* v. *Herklotz*, 190 id. 24, 27.)

The third consideration worthy of note in this connection was referred to in *Matter of Anderson* (136 Misc. 110) and the cases therein reviewed. By reason of his admission to the bar of this State, Mr. Epstein became a sworn officer of this court and as such he owes a duty of *uberrima fides*, not only to his own clients, but to the subject-matter of any litigation with which he comes in contact in a professional capacity. This duty is of a much higher character than that which would in morals be expected from a merchant in his dealings with a customer, yet in such a case any storekeeper who took good money for a worthless article would be branded as a cheat if he did not make ample reparation upon the fact being demonstrated. The obligation of an attorney to conform to an even higher standard of conduct is beyond question, and it is the duty of the court, so far as lies within its power, to see to it that its officers live up to the high obligations of their position.

For these reasons it must be held that Mr. Epstein is bound to make restitution of the $400 received by him in October, 1925,

and since the money was really a part of the funds of the estate, such refund should be made to the present official representative of that estate.

The question of his liability for interest on the sum received possesses slightly greater difficulty. On the one hand, it may be said that the withdrawal of the $1,000 was, in strictness, an illegal act. On the other hand, on the facts as they were then believed to exist, no moral culpability could be attached to it in view of the considered agreement executed by the acting representative of the Swedish Vice-Consul. There is, further, some evidence in the record to the effect that the surety was informed of the situation in September, 1925, and could have effectually prevented any depletion of the funds by the administrator. On a balancing of the equities of all of the affected parties, the court is of the opinion that Mr. Epstein's failure to return the sum in question did not become a culpable nonfeasance until the adjudication of the court directing the payment over by his client of the money of which this $400 formed a part. The decree in this regard was entered on January 30, 1930, and it must be clear that Mr. Epstein's duty to make restitution became a matured obligation at that time.

The court, therefore, determines that Joseph Epstein is liable for the payment to the administrator herein of the sum of $400, with legal interest thereon from January 30, 1930, to the date of such payment.

Enter decree, on notice, accordingly.